UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELLOGIX, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:08-cv-119 |
| ACCENTURE, LLP, | § § § | JURY DEMANDED |
| Defendant. | § | |
| | | |
| WELLOGIX, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:09-cv-1511 |
| BP AMERICA, INC., | § § § | PRIVATE ARBITRATION |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff's Motion to Compel (Doc. No. 207) and Plaintiff's Supplement to its Motion to Compel (Doc. No. 217). Oral argument was held regarding both the initial and supplemental motion on February 22, 2011 and March 31, 2011, respectively. Upon considering the Motions, all responses thereto, the arguments made by counsel, and the applicable law, the Court finds that Plaintiff's Motion to Compel must be denied.

### I. BACKGROUND

Plaintiff Wellogix brought this suit in 2008 against the following six defendants for acts alleged to have deprived Wellogix of the fruits of its intellectual property: BP America, Inc. ("BP"), Accenture, LLP ("Accenture"), SAP America, Inc. and SAP A.G. (collectively "SAP"), Thomas Ceynow ("Ceynow"), and Manfred Heil ("Heil"). Specifically, Wellogix alleged that Defendants

SAP and Accenture interfered with contracts between Wellogix and BP governing Wellogix's development of a Purchase to Pay ("P2P") software solution for BP.

At the heart of this case are Wellogix's allegations that it developed a Purchase to Pay ("P2P") software solution for BP and that Wellogix's P2P solution was misappropriated by BP, Accenture, and SAP. The following allegations are drawn from Plaintiff's amended complaint. In the oil and gas industry, a company may use procurement software to assist it in complex projects such as drilling and completing oil or gas wells. Wellogix alleges that it provided BP with its software solution to assist it in complex procurement services and that allowed BP to go "paperless" in its procurement process. After a pilot of Wellogix's software, BP and Wellogix entered into an agreement whereby BP paid Wellogix a monthly subscription fee in return for licenses granted.

Wellogix and Defendant SAP discussed creating a joint P2P software solution using a SAP software solution called Supplier Relationship Management ("SRM"). SRM's software did not possess complex functionality, but Wellogix's solution did. Although Wellogix and SRM had agreed to work together to implement a joint P2P solution for BP, SAP later approached BP separately and told BP that SAP's SRM software would contain all of the required functionality that otherwise would have been provided by Wellogix. SAP directed its employees to replicate Plaintiff's complex services functionality for integration into the SAP SRM software. BP subsequently issued a formal request for proposal for a global P2P solution to SAP and other bidders, not including Plaintiff. BP and SAP entered into an agreement whereby SAP, without Wellogix, would provide a global P2P solution for complex services. Accenture, which acted as BP's agent in the request for proposal, coordinated with BP and SAP to replicate Wellogix's functionality for global P2P.

Early in the life of this case, SAP and Heil moved to dismiss the claims for relief asserted against them under Federal Rule of Civil Procedure 12(b)(3) for improper venue. SAP argued that a forum selection clause contained in an agreement entered into between SAP and Wellogix governed the dispute between these parties. The Court agreed that the forum selection clause was mandatory and dismissed the claims asserted against SAP and Heil. (Doc. No. 54.)

Defendants BP and Ceynow subsequently filed a motion to compel arbitration of the claims for relief asserted against them by Wellogix. In May 2009, Wellogix, BP and Accenture stipulated to the severance of Wellogix's claims for relief against BP from Wellogix's claims for relief against Accenture. (Doc. Nos. 106, 107.) The former claims—as between Wellogix and BP—were ordered to private arbitration pursuant to the joint stipulation of these parties.[1] (Doc. No. 109.) The latter claims—as between Wellogix and Accenture—have continued in judicial proceedings before this Court. Wellogix's claims for relief against Accenture are: (1) breach of fiduciary duty; (2) aiding and abetting breach of fiduciary duty; (3) tortious interference with existing contracts; (4) tortious interference with prospective business relations; (5) misappropriation of trade secrets; (6) theft; and (7) conspiracy to commit the alleged torts. (Doc. Nos. 110, 126.) Fact discovery for the Wellogix-Accenture case closed on January 7, 2011. Expert discovery closed on February 16, 2011. Trial is set for May 9, 2011.

Discovery in the Wellogix-BP arbitration and the Wellogix-Accenture civil action proceeded in a consolidated fashion. In November 2009, the Court granted Wellogix's motion to compel production from BP in the arbitration. (Arbitration, Doc. No. 55.) BP was ordered to produce SAP software, including SRM and XI, as it was configured on various dates over the course of several years. In addition, BP was ordered to produce executable files, SAP SRM original

---

[1] Pursuant to the stipulation, the Court dismissed the claims against Ceynow with prejudice. (Doc. Nos. 106, 107.)

installation disks for the Global E&P P2P program, and various other software and database information. Wellogix agreed to bear the cost of production, which was approximately $23,000.00.

In December 2009, BP began producing the materials to Wellogix and completed production of the electronic data by December 31, 2009. (Arbitration, Doc. No. 59; Arbitration, BP Response to Wellogix Mot. to Compel Ex. 3.) In January 2010, BP and Wellogix wrote a joint letter to the Court requesting a postponement of the arbitration because, "despite good faith efforts by both sides, the parties have encountered unforeseen technical problems in attempting to transfer and subsequently review the SAP source code and other data that the Court recently ordered BP to produce to Wellogix." (Arbitration, Doc. No. 66.) The parties also stated that "most of the technical problems have been solved." (*Id.*) On January 20, 2010, BP completed supplemental production of all software code that had been indicated as corrupt in the December 31st production. (Arbitration, BP Response to Wellogix Mtn. to Compel Ex. 4.) On February 8, 2010, Wellogix wrote to BP and stated that "[d]iscovery is substantially complete." (*Id.* Ex. 5.) The deposition of Wellogix's expert witness, Kendyl Roman ("Roman"), took place on April 15, 2010. (Arbitration, Doc. No. 85.)

The Wellogix-BP arbitration was held in June 2010. During his testimony on June 24, Roman raised concern over the way in which BP had produced the information ordered in the Court's November 2009 order. Roman stated that BP had produced "a huge amount of data" that "were encrypted and compressed and entombed in such a way that it took many days just to go through the process of entering passwords, running decompression, running decryption and analyzing it." (June 24, 2010 Tr. 546:8, 546:11-14.) Roman stated that BP produced the data "in the way that would be most difficult to extract." (*Id.* 546:21-22.) Ultimately, Roman was unable to extract data from some of the databases produced, though it unclear whether this was because the data was impossible to extract or because Roman simply did not have time to finish the extraction.

4

(*Id.* 546:17-18, 548:7-9.) Roman stated that his team was still working and they needed "better production of this data." (*Id.* 548:18-20.) However, Roman proceeded to conduct a forensic analysis of the raw data he was able to extract, included this analysis in his expert report, and testified about his findings at the arbitration. (*Id.* 547:2-3, 548:7-9.) On June 28, Roman raised the issue of BP's problematic production again, but stated that he had enough data to conduct an analysis. (June 25, 2010 Tr. 850:18-851:20.)

In the Court's Findings of Fact and Conclusions of Law in the arbitration, the Court found that "BP produced its electronic data and other software to Wellogix and Wellogix's expert in a format that was extremely difficult to recover, decipher, and analyze." (¶ 48.)

After the conclusion of the Wellogix-BP arbitration, discovery in the Wellogix-Accenture civil action has continued. Wellogix propounded requests for production upon Accenture that sought "complex services templates" and documents related to them. (Doc. No. 207 Ex. D.) Accenture stated that it would provide responsive documents. (*Id.*)

On December 21, 2010, Wellogix took the deposition of Victor Biega, an Accenture employee. Biega described his understanding of the term "complex services templates." First, the term could refer to "simply a service that by definition is a difficult one that takes a high level of speciality." (Biega Dep. 44:13-15.). Second, the term can refer to a "to-do list; so, a list of activities such as a standard drilling plan that an organization may have in place." (*Id.* 44:16-18.) Third, complex services templates can be "an intelligent-based definition of the activities that need to be, that may vary based on the conditions that are there." (*Id.* 44:19-22.) Biega understood Wellogix's complex services templates, or dynamic templates, to fall within the third category. (*Id.* 46:1-3.) Biega testified that, during the time Accenture assisted BP, Accenture built "complex services

templates" in the sense that it gathered information to create "materials and to-do lists for particular jobs" and loaded this information into SRM's template functionality. (*Id.* 68:14-69:1.)

On January 4, 2011, Wellogix took the deposition of Mark Thomas, a former Accenture employee who worked as a senior manager in Accenture's global supply chain practice and assisted BP in implementing SAP SRM. (Thomas Dep. 22:8-16.) Thomas testified that, while at Accenture, he built "templates," which, in simple terms, consisted of a list of items needed to complete a particular job. (*Id.* 56:17-57:9.) Accenture had agreed to develop "procurement templates for the following complex services areas," including cement, perforation and gravel packing, and wireline logging, which did not already exist in SAP SRM. (*Id.* 76:7-24.) These templates included "a list that was developed of specific services and equipment for various types of complex services." (*Id.* 70:3-5.) Thomas referred to these templates as "complex services lists or templates." (*Id.* 70:24-25.) He also confirmed that the category "CFG03 Complex Services Templates" referred to the "list of materials for each of the complex services." (*Id.* 98:16-24.)

Thomas did not recall what the list, or template, looked like, but thought it may have been an Excel spreadsheet. (*Id.* 70:9-10.) The content in the templates was loaded into a "development environment," which meant that it was manually entered into a standard SAP SRM document, such as a shopping cart, and saved for reuse. (*Id.* 70:7; 71:9-12; 77:20-22.) In addition, Thomas testified that the templates would have been stored on SharePoint, a sharing system for the project. (*Id.* 99:4-9.) Thomas did not believe that the templates ever reached a testing stage or were migrated into a "Q/A environment format." (*Id.* 70:19-71:1.) Thomas also testified that creating a template did not require development of source code. (*Id.* 57:9-11.)

As a result of Thomas's deposition, Wellogix's counsel appears to have contacted Accenture's counsel in early February in order to inquire further about its prior request for

production of documents relating to "complex services templates." (Doc. No. 207 Ex. B.) Accenture's counsel responded by stating that all of Thomas's work product for BP had been provided to BP. (*Id.*) In addition, Accenture's counsel represented that it had diligently searched among the documents within its possession, custody, and control for documents pertaining to "complex services templates." (*Id.*) This motion to compel has followed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) permits parties to obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense." Under Rule 37, a party may move for an order compelling disclosure or discovery. Fed. R. Civ. P. 37(a)(1.)

In determining whether a motion to compel has been timely filed, most courts look to the discovery deadline. *See Jackson v. Boise Locomotive*, 2009 U.S. Dist. LEXIS 64832, *19 (S.D. Tex. July 28, 2009); *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 2009 U.S. Dist. LEXIS 5422, *28 (S.D. Tex. Jan. 27, 2009). However, certain courts have taken into account other factors to be considered when deciding whether a motion to compel filed after the close of discovery is untimely:

> (1) the length of time since the expiration of the deadline, (2) the length of time that the moving party has known about the discovery, (3) whether the discovery deadline has been extended, (4) the explanation for the tardiness or delay, (5) whether dispositive motions have been scheduled or filed, (7) the age of the case, (8) any prejudice to the party from whom late discovery was sought, and (9) disruption of the court's schedule.

*Days Inn Worldwide, Inc. v. Sonia Investments*, 237 F.R.D. 395, 398 (N.D. Tex. 2006).

## III. ANALYSIS

Wellogix argues that BP and Accenture must be compelled to produce two types of information: (1) any "complex services templates" that may have been developed; and (2) the electronic data that BP produced in response the Court's November 2009 order, in a manner that

can be utilized by Wellogix. BP and Accenture both oppose this motion for various reasons that will be described below.

### A. Complex Services Templates

Wellogix argues that Thomas's deposition testimony shows that Accenture produced complex services templates for BP and that BP and Accenture have failed to produce these templates in response to Wellogix's requests. Accenture contends that the "templates" referred to by Thomas are merely lists of material, equipment, and labor, and not similar to the "complex services templates" developed by Wellogix.  In addition, Accenture contends that, at most, all it did was place these lists in standard SAP SRM templates. The standard SAP SRM templates would have been placed only in a "development" system, and not within a live production system that was actually put into use at BP. Accenture also argues that all of the work product it prepared in connection with the P2P project was provided to BP, and so Wellogix should review BP's production for documents related to BP's P2P project. Finally, Accenture contends that it searched for documents referring or relating to complex services, including "complex services templates" or the identifier "CFG03," and has already produced all responsive documents.

BP objects to the filing of the Motion to Compel BP to produce documents because BP is not a party to the Wellogix-Accenture civil action and the relevant portion of the Wellogix-BP arbitration has concluded. In addition, BP contends that it has produced all responsive documents to Wellogix regarding complex services templates. The search terms used for BP's production include "Tracy Galloway" and "Lesley Philip" of BP, "Victor Biega" and "Mark Thomas" of Accenture, and the terms "Accenture," "complex services," and "Dynamaps." BP states that the electronic data it produced in response to the Court's November 2009 order would contain any complex services templates allegedly developed by Accenture for use by BP even if they had not been captured and

produced to Wellogix during earlier document production. Finally, BP argues that the "templates" and "complex services templates" that were created by Accenture were merely to-do lists and in no way resembled Wellogix's complex services templates, which are dynamic in nature.

As an initial matter, we note that this motion to compel has been untimely filed. The discovery deadline in the Wellogix-BP arbitration occurred months ago, while the discovery deadline in the Wellogix-Accenture civil action was January 7, 2011. Wellogix became aware of Accenture's role in creating "templates" and loading them onto SAP SRM software during Biega's deposition on December 21, 2010 and during Thomas's deposition on January 4, 2011. However, Wellogix did not seek the court's assistance in obtaining discovery of these templates until one month after the discovery deadline. *See Jackson*, 2009 U.S. Dist. LEXIS 64832 at *19 (holding that motion to compel filed over one month after close of discovery was untimely); *Suntrust Bank v. Blue Water Fiber, L.P*., 210 F.R.D. 196, 200-01 (E.D. Mich. 2002) (failure to promptly enforce discovery rights constitutes a waiver of such rights).

On the other hand, it appears that the "templates" to which Biega and Thomas refer may be relevant to this case. The threshold for relevance in discovery matters is extremely low. So long as discovery is "reasonably calculated to lead to the discovery of admissible evidence," it is relevant. Fed. R. Civ. P. 26(b)(1). Biega and Thomas both use the term "template" as shorthand to refer to a "complex services template." Both are clear that the "templates" or "complex services templates" they created for BP consisted of to-do lists of materials and tasks, and that the content from the "templates" and "complex services templates" were loaded onto standard SAP SRM documents. They are also both clear that the "templates" or "complex services templates" they created for BP were different from the Wellogix "complex services templates," which were dynamic templates rather than simple lists of materials and tasks. However, Wellogix is entitled to obtain the

9

"templates" and "complex services templates" that Biega and Thomas created in order to determine for itself the similarity between Accenture's "templates" and "complex services templates," on the one hand, and Wellogix's "complex services templates," on the other.

With respect to Accenture's and BP's contention that they conducted the necessary searches to find responsive documents, it does not appear that either focused on using just the term "template" in their searches. Accenture used the term "complex services templates" and "CFG03." BP used the terms "complex services," "Thomas" and "Biega." Considering, however, that Biega and Thomas often used the word "template" interchangeably with the phrase "complex services template," it is possible that certain documents that only contain the word "template" were not found.

As for Accenture's contention that its work product was uploaded onto BP's SharePoint site, this does not relieve Accenture of its duty to review the documents that remain within its possession, custody and control to find and produce responsive documents. Neither does BP's reliance on its prior production of electronic data relieve it of its duty to review documents within its possession, custody and control. As we have found, the electronic data produced was extremely difficult to decipher and analyze.

Though we will not order the production of the electronic data that was the subject of the November 2009 order, we do order Accenture and BP to review all other documents, files, and other types of information in their custody, possession and control for the term "template" and to produce items responsive to Wellogix's request to produce "complex services templates" of any type or definition that were created by Accenture or BP. Since BP is not a party to the Wellogix-Accenture civil action, Wellogix may issue to BP a subpoena pursuant to Federal Rule of Civil Procedure 45 in order to obtain responsive items.

### B. BP's Production of Electronic Data

Wellogix requests that BP again produce the electronic data ordered in this Court's November 2009 order, or allow Wellogix's expert Roman direct access to BP's computer system. Wellogix bases these arguments on the purported notice it was given during the deposition of Accenture's and BP's expert Deon Smith that Smith had direct access to BP's production server in order to conduct his analysis. Further, Wellogix believes that it has only been provided with BP's development server, and was never given access to BP's Q&A and production servers. Smith testified that Wellogix's complex services templates, if they existed on BP's systems, would be found on BP's Q&A and production servers.

In response, Accenture argues first that Wellogix's theory of trade secret misappropriation by Accenture is not founded upon BP's use of Wellogix's information, but rather upon SAP's use of Wellogix's information. Therefore, it is irrelevant to this case whether BP's systems contain Wellogix's source code. In addition, Accenture contends that this request is extremely late. After BP's second production in January 2010, Wellogix acknowledged that the production was complete. During the BP arbitration, however, Wellogix's expert Mr. Roman raised issues about BP's faulty production. After the arbitration, Wellogix did not ask for further evidentiary hearing even though it was given the opportunity to do so. Therefore, Wellogix's current request is simply a delay tactic.

In its response, BP denies that it is withheld any information. It argues that Wellogix is raising this issue at a very late juncture, and that if the information truly were indecipherable, Wellogix would have raised this issue before the arbitration. Next, BP argues that it was severed from the Wellogix-Accenture civil action, so it is not subject to discovery in the civil action, and it has not been served with a subpoena. BP also contends that it was cooperative with Wellogix in

11

producing the electronic data, including granting access to Wellogix's technical expert and replacing data that had become corrupted. Finally, BP claims that it provided Wellogix with both the development and the production systems.

Essentially, Wellogix is seeking two things: either a completely redone production of the electronic data that was the subject of our November 2009 order or access by Roman to the electronic data viewed by Smith. Neither of these requests is timely. Wellogix received BP's production of purportedly uncorrupted data in January 2010. From that point until the arbitration in June 2010, Wellogix did not notify the Court of its problems unraveling BP's electronic data nor seek to have BP produce the electronic data again. During the arbitration, Wellogix's expert described problems he had faced in deciphering the electronic data, but confirmed that he had been able to decipher sufficient amounts of data in order to analyze the source code and render an expert opinion. Wellogix did not seek to continue the arbitration to allow their expert additional time to conduct his analysis, or to obtain a new version of the electronic data from BP. After the Findings of Fact and Conclusions of Law were issued, Wellogix again did not raise the issue of BP's improper production of electronic data, even though it remained relevant to Wellogix's claims against Accenture. The facts learned during the depositions of Biega, Thomas, and Smith certainly highlight the relevancy of the data that may remain unusable and unreadable. However, Wellogix knew that this data, insofar as it contained its trade secrets and evidence of misappropriation, was relevant even before these individuals were deposed. Ordering BP to produce the electronic data again would result in the delay of the Wellogix-Accenture trial. Wellogix's delay in seeking to compel a reproduction of the electronic data cannot be excused.

As for granting Roman access to the same BP servers to which Smith had access, BP's counsel informed the Court that these servers have been decommissioned. Though backup disks of

the information contained on the servers do exist, the servers would have to be reconstituted in order for the information on the disks to be available to Roman. Wellogix has not provided a copy of the deposition in which Smith states that he was granted direct access to the BP servers, so we are left without an understanding of how recently Wellogix learned of Smith's access. Accenture contends that Smith last accessed BP's servers in June 2010, but its citations to Smith's June 8, 2010 deposition do not support this contention. Given the late nature of this request and the imminent trial, we cannot conclude that Wellogix is entitled to have its expert access these servers at this stage in the case.

Second, Wellogix appears to request more information than what was ordered to be produced in our November 2009 Order. Wellogix contends that it received only BP's development system, and now seeks BP's Q&A and production systems. BP argues that it produced both its development and its production systems. BP makes no argument regarding the Q&A system and does not dispute its relevance to this case. Again Wellogix has not submitted a copy of Smith's deposition in which he discusses the relevance of the development, Q&A, and production servers to finding complex services templates. We do not know for how long Wellogix has been aware of the potential relevance of Q&A and production servers or systems to this case. This information is significant because, considering the untimeliness of the motion to compel, we must consider whether the untimeliness is justified and whether the benefit of ordering production would outweigh the inconvenience that would result from a delay of trial. We do not find that Wellogix has provided sufficient evidence to find that (1) the Q&A and production systems are relevant to this case, and (2) that the Q&A and production systems have not been produced. Therefore, we must deny Wellogix's motion to compel BP and Accenture to produce BP's electronic data once again or to allow Roman direct access to BP's servers.

## IV. CONCLUSION

Plaintiff's Motion to Compel (Doc. No. 207) and Plaintiff's Supplement to its Motion to Compel (Doc. No. 217) is **GRANTED IN PART** and **DENIED IN PART.** Accenture and BP are **ORDERED** to review all documents, files, and other types of information in their custody, possession and control other than the electronic data subject to the November 2009 Order for the term "template," and to produce items responsive to Wellogix's request to produce "complex services templates" of any type or definition that were created by Accenture or BP.

**IT IS SO ORDERED**.

**SIGNED** this the 15th day of April, 2011.

*[signature]*

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE